# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| **SPECTRUM GULF COAST LLC,** § § § | |
| *Plaintiffs,* § § | |
| v. § § | Civil Action No. <u>5:22-cv-00094</u> |
| **CITY PUBLIC SERVICE OF SAN ANTONIO,** § § § § | JURY TRIAL DEMANDED |
| *Defendant.* § § | |

## ORIGINAL COMPLAINT

Plaintiff Spectrum Gulf Coast LLC ("Spectrum") brings this Complaint, seeking damages and declaratory and injunctive relief against Defendant City Public Service of San Antonio ("CPS Energy" or "CPS"), and alleges as follows:

## INTRODUCTION

1. Spectrum brings this case to recover damages from San Antonio's municipally-owned utility, CPS, for charging Spectrum years of rental fees to deploy its communications attachments to CPS's utility poles in stark violation of a 2016 Pole Attachment Agreement ("2016 Agreement") between the parties, and to prevent CPS from doing so again in the future.

2. In order to construct and operate its aerial plant, Spectrum must rely on existing utility pole infrastructure. That means that to operate its cable system serving the San Antonio area, Spectrum must rely upon the poles owned or controlled by CPS, San Antonio's municipally-owned utility. In order to use CPS's poles, Spectrum must have a license to do so, and since 2016, has accessed CPS's poles pursuant to the 2016 Agreement. That Agreement

expressly details how CPS may calculate and charge Spectrum annual fees for Spectrum's pole attachments, including the types of attachments for which CPS may bill annual rental fees.

3. Under the 2016 Agreement, which incorporates CPS's Pole Attachment Standards, CPS is only permitted to charge Spectrum annual fees for pole "Attachments." But the definition of the term "Attachment" in the 2016 Agreement and CPS's own Pole Attachment Standards expressly excludes "service drops" attached to CPS's poles—*i.e.*, cables or wires that Spectrum and other communications attachers run directly from CPS poles to individual customers' homes or businesses (as opposed to the wires Spectrum strings *between* CPS poles, which are known as "mainline" attachments).

4. Long before Spectrum's and CPS's 2016 Agreement, the parties did not consider, count, or charge/pay rent for service drops as formal "attachments," because of the nature and circumstances giving rise to those kind of facilities. Unlike mainline attachments that a cable operator makes to build out its aerial network in a given area, service drop attachments are lightweight cable attachments installed by Spectrum field personnel if and when necessary actually to connect a customer's residence or business to the cable network, such as when it is necessary for an attaching service cable to clear a road or driveway. Those kinds of localized, on-the-ground details are generally unknown when field personnel submits permits for mainline attachments in a given area and only discovered at the time a service technician arrives to connect a specific customer. As such, service drop attachments have not been historically subject to a utility's advance permitting requirements or tracked by the cable operator. That, in turn means pole owner utilities and cable operator attachers do not generally keep accurate records of how many service drop attachments a cable operator has made until there is an audit of pole attachments that includes the counting of service drop attachments. Service drops also do

not typically use any additional space on a pole beyond that already occupied by an existing mainline pole attachment.

5.  Consistent with this practice and the practical reasons for it, the 2016 Agreement between Spectrum and CPS makes abundantly clear that since 2016 and continuing today, CPS cannot charge Spectrum any annual pole attachment rent for Spectrum's service drops attached to CPS's poles.

6.  Despite that clear contractual prohibition, however, Spectrum has come to learn that CPS has charged and collected substantial sums from Spectrum for service drops.

7.  For the 2018 billing year alone, the number of attachments CPS charged Spectrum for attaching to CPS's poles has been a moving target following on the first pole attachment inventory CPS conducted of its own poles in living memory in 2016-2017. Pole attachment audits typically are used by pole owners to attempt to determine accurate pole attachment counts owing to a variety of factors, including changes to poles and attachments resulting from environmental factors, such as storms; changes to the built environment where poles may be added to existing lines; poor record keeping by pole owners and attacher; and attachments that are made outside a utilities' standard permitting process, such as, as noted above, service drops or other emergency and non-standard attachments. In light of all these factors that can impact the number of attachments in a given area, period audits generally are used by pole owners to confirm accurate counts and reset an attacher's baseline attachment number in a given year.

8.  But to the extent those attachment numbers are translated into pole attachment *charges*, it depends on what the pole owner is permitted to count as billable "attachments." And

here, CPS expressly prohibited by the terms of the 2016 Agreement from counting service drops attached to CPS poles as billable "attachments."

9. In the course of conducting its pole attachment inventory in 2016-2017, CPS allegedly determined that Spectrum had more than 194,000 "attachments" on CPS poles. Using that count, in January 2018, CPS sent Spectrum a pole "attachment" invoice, acting as if all "attachments" on that invoice were billable. But CPS revised its invoice in February 2019, and then again in August 2020, purporting to reduce both the number of total attachments and the charge per attachment. The repetitive issuance of shifting and discrepant invoices only further confused whether CPS was improperly billing Spectrum for service drops or other attachments.

10. Spectrum has now finally determined that CPS has indeed inflated its invoices to Spectrum by including tens of thousands of service drops in the total number of "attachments" for which CPS billed—in direct breach of the parties' 2016 Agreement.

11. Spectrum therefore brings this action to recover sums CPS improperly charged, collected, and retained from Spectrum as well to have the Court declare that CPS may not charge (and enjoin CPS from continuing to charge) Spectrum annual pole attachment fees for service drops attached to CPS poles.

## PARTIES

12. Spectrum is a franchised cable provider that has provided various communications services – cable video, broadband internet access, mobile, and digital voice – to residents and businesses in and around the City of San Antonio for decades. Spectrum operates in San Antonio pursuant to a state issued certificate of franchise authority, and is party to a 2016 pole attachment agreement with CPS.

13. Spectrum is a limited liability company. It is registered to do business in Texas, and its San Antonio business address is 1900 Blue Crest Lane, San Antonio, Texas, 78247.

14. Spectrum was previously named Time Warner Cable Texas, LLC, but amended its name to Spectrum Gulf Coast, LLC on October 26, 2018 with the Public Utility Commission of Texas.

15. Defendant CPS is a municipal utility owned by the City of San Antonio that provides electricity and natural gas to consumers in San Antonio, with its principal office in San Antonio Texas.  *See* Tex. Util. Code § 11.003(11) (" 'Municipally owned utility' " means a utility owned, operated, and controlled by a municipality or by a nonprofit corporation the directors of which are appointed by one or more municipalities.").

16. Based upon public information, CPS may be served through its registered agent, City Clerk, Debbie Racca-Sittre, at 719 S. Santa Rosa, San Antonio, Texas 78204.

## JURISDICTION & VENUE

17. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds the jurisdictional minimum.

18. CPS is a municipally-owned utility that is owned by the City of San Antonio, which itself is a Texas political subdivision.  Therefore, CPS is a citizen of the State for diversity jurisdiction purposes.  *See Moor v. Alameda Cnty.*, 411 U.S. 693, 717 (1973) (holding political subdivisions of a state are citizens for diversity jurisdiction purpose).

19. Spectrum is a limited liability company with one member, Time Warner Cable Enterprises, LLC.  Time Warner Cable Enterprises, LLC's, ultimate incorporated entity members are incorporated in the States of Delaware and New York and have their principal places of business in the States of Connecticut and New York.  Thus, neither Spectrum, nor its members, nor its members' members, are incorporated in, reside in, are citizens of, or have a principal place of business in Texas.  Exhibit ("Ex.") A.

20. The amount in controversy exceeds the jurisdictional minimum of $75,000. CPS has improperly charged and collected from Spectrum excessive pole attachment fees in breach of it and Spectrum's pole attachment agreement in excess of $2 million (not including interest), as well as caused Spectrum to suffer additional harms as a result.

21. Venue is proper in this District because CPS is located here, and a substantial part of the events giving rise to Spectrum's claims occurred here as well. *See* 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

**I. Pole Attachments Are An Essential Facility For Communications Providers Like Spectrum.**

22. Poles are essential facilities for the provision of advanced electronic communications services such as those that Spectrum provides to its customers throughout the greater San Antonio area, and across the State of Texas.

23. Communications providers, including cable operators and video providers like Spectrum. "have no cost-effective alternative but to pay pole owners' stated rental fees to construct a network of wires and cables that will be insulated from people and vehicles." *Time Warner Cable Texas LLC, et al., v. CPS Energy*, 593 S.W.3d 291, 294 (Tex. 2019).

24. The United States Supreme Court has observed that "[c]able television operators, in order to deliver television signals to their subscribers, must have a physical carrier for the cable" and that "[u]tility compan[ies'] poles provide, under such circumstances, virtually the only practical medium for the installation of television cables." *FCC v. Florida Power Corp.*, 480 U.S. 245, 247 (1987); *see also Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 330 (2002) (Cable operators "have found it convenient, and often essential, to lease space for their cables on telephone and electric utility poles.").

## II. The Parties' 2016 Pole Attachment Agreement and CPS's Pole Attachment Standards.

25. Spectrum has attached to CPS's utility poles to provide communications services, including broadband internet access service, under a "standard pole attachment license agreement" between the parties that was entered in August 2016. Ex. B ("2016 Agreement").

26. Section 3.1 of the 2016 Agreement states: "Pursuant to this Agreement and the incorporated Pole Attachment Standards, ***CPS Energy shall assess, and Licensee shall pay, fees and charges for the privilege of installing and maintaining Attachments onto Poles . . .***" (emphasis added).

27. Section 3.1 of the 2016 Agreement further provides that Spectrum must pay CPS's invoiced pole attachment invoices within 45 days of Spectrum's receipt of the invoices. *Id*. Failure to timely pay the invoices "for Attachments or other applicable fees or charges in accordance with their terms shall constitute a breach of this Agreement." *Id*.

28. Similarly, pursuant to Section 23 of the 2016 Agreement, if Spectrum fails to pay "an amount due within the period of time set forth for payment," interest accrues on the unpaid balance at the rate of 17% per month ("or such lesser rate as may be required by law") for each month starting from the date of the payment is due until such time as payment is received.

29. In other words, if Spectrum failed to pay CPS invoices in strict accordance with the amount demanded in an invoice, CPS could allege that Spectrum had breached the Agreement and assess interest.

30. The 2016 Agreement had an initial term of 5 years, and automatically renewed for successive one-year terms (and was not modified or abrogated), until the present. *See id*. at Recital F.

31.     The 2016 Agreement – including its payment requirements – expressly incorporates by reference the definitions, duties, procedures, and requirements of CPS' Pole Attachment Standards that were promulgated August 1, 2016, but "as amended from time to time." *Id*. §§ 1.14, 2.1, 2.2, & 3.1.

32.     The Agreement further specifies that "***Attachment*** shall have the meaning set forth in the Pole Attachment Standards." *Id*. § 1.2.

33.     The Agreement also specifies that "***Attachment Rate*** shall have the meaning set forth in the Pole Attachment Standards." *Id*. § 1.4.

34.     While the 2016 Agreement itself does not mention "Service Drops," CPS's Pole Attachment Standards in effect at the time the Agreement was executed – *and expressly incorporated into the Agreement* – define Attachment to mean:

> (a) each aerial cable together with its associated Messenger cable, guy wire, anchors, and associated hardware, and each amplifier, repeater, receiver, appliance or other device or piece of equipment, whether comprised of steel . . . or other media or material utilized to provide Communications Services; and (b) any hardware or equipment identified in Section II.A.15 affixed to a CPS Energy Pole utilizing one foot or less of Communication Space. An Attachment occurs whether Attaching Entity's Communication Facilities are connected to the Pole itself or are supported by an Attachment Arm, bracket, support stand, or other support devices, provided however that ***Overlashing an existing Permitted Attachment and Service Drops shall not count as separate Attachments***.

Ex. C ("CPS Pole Attachment Standards Version 1") § II.A.7 (emphasis added).[1]

35.     CPS's Pole Attachment Standards Version 1 further defined "Service Drop or Non-Guyed Service Drop" to mean: "a single wired drop installed to provide Communications Service to an individual customer measured from the customer premises to the closest available

---

[1] Section II.A.15 of CPS Pole Standards Version 1.0 was likely intended to refer to Section II.A.16, which defines "Communications Facility" and does not refer to drops.

Pole without requiring any additional anchors or guys to comply with all Applicable Engineering Standards. Service Drops are subject to all terms and conditions of these Standards." *Id*. § II.A.55.

36. CPS's Pole Attachment Standards have been revised several times since 2016. But each subsequent version, including the current version (Version 5, effective January 2021), has employed the same – if not identical – definition of "Attachment" and "service drop."[2]

37. For example, Section II.A.10 of CPS Pole Attachment Standards Version 5, which sets for the definition of "Attachment," again provides that "***Overlashing an existing permitted Attachment and Service Drops shall not count as separate Attachments.***" Ex. D ("CPS Pole Attachment Standards Version 5") § II.A.10.

38. Version 5 of CPS's Pole Attachment Standards also defines "Service Drop" to mean "a single wired drop installed to provide Communications Service to an individual customer measured from the customer premises to the closest available Pole without requiring anchors or guys to comply with all Applicable Engineering Standards. *Id*. § II.A.114. Service drops are also "subject to all terms and conditions of these Standards," unless expressly stated otherwise. *Id.*

39. In short, the 2016 Agreement and CPS's Pole Attachment Standards do not allow CPS to charge Spectrum pole attachment fees for service drops, regardless of whether Spectrum also has a permitted attachment on the same pole.

---

[2] CPS's Pole Attachment Standards, including many of their prior versions, are publicly available on CPS's website. https://www.cpsenergy.com/en/construction-and-renovation/pole-attachment-services.html.

### III. CPS Overcharged Spectrum Pole Attachment Rent in Breach of the 2016 Agreement.

40. In 2016, CPS commenced an inventory of pole attachments on its poles. This was the first such inventory CPS had conducted in decades.

41. On or around January 19, 2018, Spectrum received an invoice from CPS dated or printed January 4, 2018 for "2018 Pole *Attachments*." (emphasis added).[3] On its January 4, 2018, invoice, CPS charged $14.54 per pole attachment and demanded Spectrum to pay $2,826,735.94 for 2018 pole attachments – based on CPS having allegedly determined in its inventory that Spectrum had "attachments" on more than 194,000 poles.

42. On February 15, 2019, CPS issued a "revised invoice" for the 2018 pole attachments, which directed Spectrum to "disregard [the] invoice . . . dated 01/04/2018." While CPS continued to demand $14.54 per pole attachment, the revised invoice adjusted down the number of pole attachments such that CPS now demanded Spectrum to pay a total of $2,804,620.60 for 2018 pole attachments.

43. On February 18, 2019, CPS issued an invoice to Spectrum for "2019 Pole *Attachments*." (emphasis added). On this invoice, CPS charged $14.40 per pole attachment and demanded Spectrum to pay a total of $2,809,800.00 for 2019 pole attachments.

44. On or around July 30, 2019, Spectrum paid CPS $1,890,322.00 of the $2,804,620.60 that CPS demanded with its February 15, 2019, revised invoice for 2018 pole attachments. Before paying any further amounts demanded by CPS, Spectrum requested

---

[3] While CPS's invoice was dated January 4, 2018, for reasons unknown, CPS did not deliver it to Spectrum until on or around January 19, 2018.

information sufficient to determine whether CPS's 2018 pole attachment rate complied with the maximum permissible pole attachment rate under Texas law, as it is entitled to do by law.[4]

45. On or around August 7, 2019, Spectrum paid CPS $1,894,663.75 of the $2,809,800.00 that CPS demanded with its February 18, 2019, invoice for 2019 pole attachments. Spectrum similarly declined to pay further amounts demanded by CPS for 2019 pending the provision of information sufficient to determine whether CPS's 2019 pole attachment rate complied with Texas law.

46. On November 4, 2019, CPS sent a "notice of contract default" letter to Spectrum regarding the invoices for "Pole *Attachment* Rental Payments for 2018 and 2019" (emphasis added). In its letter, CPS invoked Section 3.1 of the 2016 Agreement (which only permits CPS to charge Spectrum fees for "attachments"), and stated Spectrum had 15 days to pay the remaining balances on CPS's February 15, 2019, revised invoice (for 2018 pole attachments) and February 18, 2019, invoice (for 2019 pole attachments), plus interest. CPS included with its letter an invoice for $1,981,916.85. If Spectrum did not pay, CPS threatened to consider Spectrum in "default" of the 2016 Agreement.

47. On August 11, 2020, after providing rate calculation back up data that Spectrum had requested from CPS for months, and after Spectrum disputed CPS's original 2018 and 2019 rate calculations, CPS sent Spectrum a *second* revised invoice for 2018 pole attachments, a first revised invoice for 2019 pole attachments, and new invoice for 2020 pole attachments.

---

[4] *See* Tex. Util. Code § 54.204(c) ("A municipality or a municipally owned utility may not charge any entity, regardless of the nature of the services provided by that entity, a pole attachment rate or underground conduit rate that exceeds the fee the municipality or municipally owned utility would be permitted to charge under rules adopted by the Federal Communications Commission under 47 U.S.C. Section 224(e) if the municipality's or municipally owned utility's rates were regulated under federal law and the rules of the Federal Communications Commission.").

48. In a cover letter accompanying the invoices, CPS explained that its invoices were "late" and "revised" because CPS had to adjust its rate calculations to account for "more accurate pole counts" – a necessary input for calculating pole attachment rates under Texas law. As a result of this "assessment," CPS claimed it had "determined that the 2018 and 2019 invoices should be recalculated and trued-up . . . ."

49. Based on these purported "revisions," "re-revisions," and "recalculations" of its pole count, CPS on August 11, 2020:

- Adjusted its rate for 2018 pole attachments to $14.02 per pole attachment (reduced from $14.54) and charged Spectrum $813,995.80 in unpaid balance;

- Adjusted its rate for 2019 pole attachments to $13.95 per pole attachment (reduced from $14.40) and charged Spectrum $827,330.00 in unpaid balance; and

- Charged $14.52 per pole attachment for 2020 pole attachments and charged Spectrum $2,864,175.60.[5]

50. On December 30, 2020, Spectrum paid CPS the remaining $813,995.80 balance for 2018 pole attachments as well as the remaining $827,330.00 balance for 2019 pole attachments, as demanded in CPS's August 11, 2020, invoices.

51. On June 24, 2021, Spectrum paid CPS the $2,864,175.60 CPS demanded for 2020 pole attachments.

52. On June 10, 2021, CPS issued an invoice to Spectrum for 2021 pole attachments. With this invoice, CPS charged $16.07 per pole attachment and CPS demanded Spectrum to pay $3,191,164.53 for 2021 pole attachments.

53. Even though CPS was not entitled or permitted to charge Spectrum pole attachment fees for service drops attached to CPS's poles (*i.e.*, count service drops as

---

[5] CPS's invoice for 2020 pole attachments deducted $330.00 in court costs CPS owed Spectrum from a separate litigation.

"Attachments"), Spectrum has now learned that each of the pole attachment invoices from CPS noted above counted tens of thousands of Spectrum's service drops as Attachments for billing purposes.

54. In other words, with its invoices for 2018, 2019, 2020, and 2021 pole attachments, CPS overcharged and collected from Spectrum millions of dollars in fees for facilities that CPS was not permitted to count as billable pole "Attachments."

55. Each of CPS's invoices noted above stated that Spectrum could be subject to "a monthly interest charge of 1.17% *per current pole attachment licensing agreement* with CPS Energy" (emphasis added) if Spectrum did not fully and timely pay the invoices.

56. To preserve its ability to deploy its network on CPS's poles, on January 10, 2022, Spectrum paid CPS the $3,191,164.53 CPS demanded for 2021 pole attachments.

57. In a letter accompanying the payment, Spectrum made clear its payment was without prejudice and contingent on Spectrum's reservation of its rights to seek at true-up of this and past payments to CPS.

## CLAIMS FOR RELIEF

## COUNT I

### (Breach of Contract)

58. Spectrum repeats, realleges, and incorporates herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

59. Spectrum's 2016 Agreement with CPS is a legally-binding contact that governs Spectrum's use of CPS's poles to place and install Spectrum's communications facilities as well as the rates CPS could charge Spectrum to attach to its poles.

60. Under the parties' 2016 Agreement, CPS is neither entitled nor permitted to charge Spectrum for service drops attached to CPS's poles.

61. Instead, the 2016 Agreement provides that "CPS Energy shall assess, and Licensee shall pay, fees and charges for the privilege of installing and maintaining *Attachments* onto Poles . . . ." 2016 Agreement § 3.1 (emphasis added).

62. The term "Attachments" has been consistently defined by CPS's Pole Attachment Standards specifically to exclude "Service Drops" since August 1, 2016. *See* 2016 Agreement § 1.2; CPS Pole Attachment Standards Version 1 §§ II.A.7; CPS Pole Attachment Standards Version 5 § II.A.10.

63. As the 2016 Agreement only permits CPS to charge Spectrum for "Attachments," and "Attachments" specifically do not include service drops, CPS was not, and is not, permitted to include, and should not have included, any of Spectrum's service drops that are attached to CPS's poles in its annual pole attachment invoices to Spectrum.

64. Despite these express requirements and limitations of the 2016 Agreement, however, CPS counted Spectrum's service drops attached to CPS's poles as pole "Attachments," and improperly included them as part of CPS's invoices to Spectrum for 2018, 2019, 2020, and 2021 pole attachments.

65. On information and belief, CPS is continuing this practice today.

66. Each of the aforementioned invoices CPS sent to Spectrum constituted separate breaches of the 2016 Agreement.

67. The 2016 Agreement has remained in effect and not been modified since August 2016.

68. CPS's contractual breaches of the 2016 Pole Attachment Agreement are material.

69. CPS's contractual breaches have harmed and continue to harm Spectrum by overcharging, collecting, and retaining from Spectrum millions of dollars.

70. All conditions precedent have been fulfilled.

71. Spectrum is entitled to damages and declaratory and injunctive relief to remedy CPS's material breaches of contract.

72. Spectrum is also entitled to reasonable attorneys' fees pursuant to Section 24 of the 2016 Agreement, which provides that if Spectrum as "Licensee" "brings any action at law or in equity to enforce any provision of this Agreement, including the incorporated Pole Attachment Standards, the prevailing party will be entitled to recover its reasonable attorney's fees in addition to any other relief to which it may be entitled."

## COUNT II

### (Money Had and Received)

73. Spectrum repeats, realleges, and incorporates herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

74. As a result of CPS's aforementioned conduct, CPS holds money that, in equity and good conscience, belongs to Spectrum.

75. CPS has improperly overcharged, collected, and retained millions of dollars in pole attachment fees for Spectrum's service drops.

76. As a direct and proximate result of CPS's actions, Spectrum has suffered and will continue to suffer harm and damages.

77. CPS should be ordered to account for and immediately remit its ill-gotten funds to Spectrum, and be further enjoined from its actions in violation of the 2016 Agreement.

## COUNT III

### (Declaratory Judgment Under 28 U.S.C. §§ 2201 & 2202)

78. Spectrum repeats, realleges, and incorporates herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

79. An actual and justiciable controversy exists between Spectrum and CPS regarding CPS's charging, collecting, and retaining pole attachment fees from Spectrum for pole for service drops for years, and continuing today.

80. Spectrum disputes CPS's material breach of its contractual obligations under the parties' 2016 Agreement not to charge pole attachment fees for service drops.

81. Spectrum seeks a declaration that CPS has breached its 2016 Agreement with Spectrum by overcharging Spectrum and improperly retaining millions of dollars in funds from Spectrum for service drops attached to CPS's poles, which CPS improperly counted as "Attachments" under the 2016 Agreement.

82. Spectrum seeks a further declaration that CPS may not charge Spectrum pole attachment fees for service drops going forward.

83. Pursuant to 28 U.S.C. §§ 2201 and 2202, a judicial determination of the respective rights of the parties is necessary and appropriate under the circumstances, in addition to such further necessary or proper relief the Court deems appropriate.

## JURY DEMAND

84. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Spectrum hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

85. Spectrum respectfully requests that this Court grant it the following relief:

   (1) Award Spectrum damages, including but not limited to compensatory damages and exemplary damages, pursuant to applicable laws and as determined by the finder of fact, for all pole attachment fees CPS overcharged, collected, and retained from Spectrum;

   (2) A declaratory judgment in favor of Spectrum finding and determining that as announced, CPS breached the 2016 Agreement with Spectrum by overcharging, collecting, and retaining from Spectrum pole attachment fees for service drops;

(3) An order enjoining CPS Energy from charging Spectrum pole attachment fees for service drops

(4) Award Spectrum pre- and post-judgment interest;

(5) As to all claims, award Spectrum its reasonable attorneys' fees and costs in preparing, filing, and prosecuting this action; and

(6) Award Spectrum any and all additional relief that the Court deems just and proper, including, as applicable, costs and attorneys' fees.

Dated: February 3, 2022

Respectfully Submitted,

/s/  *Amanda L. Cottrell*
Amanda L. Cottrell (Texas Bar No. 24064972)
Steven G. Gersten (Texas Bar No. 24087579)*
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
2200 Ross Avenue, 24th Floor
Dallas, Texas 75201
Tel. (469) 391-7400
Fax (469) 391-7401
acottrell@sheppardmullin.com
sgersten@sheppardmullin.com

Paul A. Werner*
Abraham J. Shanedling*
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1931
Fax (202) 747-3817
pwerner@sheppardmullin.com
ashanedling@sheppardmullin.com

*W.D. Texas admission pending

***Attorneys for Plaintiff Spectrum Gulf Coast LLC***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 3, 2022 a true and correct copy of the foregoing document was served on Defendant City Public Service of San Antonio via its registered agent.

*/s/ Amanda L. Cottrell*
Amanda L. Cottrell